**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA**

**CYNTHIA CHILDERS**                                           **CIVIL ACTION**

**VERSUS**                                                                 **NO. 21-960**

**RENT-A-CENTER EAST, INC., ET AL.**                    **SECTION: "G"**

<u>**ORDER AND REASONS**</u>

Plaintiff Cynthia Childers ("Plaintiff") brings this suit against Defendants RAC Acceptance Now East, LLC ("RAC"), Experian Information Solutions, Inc. ("Experian"), and Trans Union, LLC ("Trans Union") (collectively, "Defendants").[1] Plaintiff alleges that an account was fraudulently opened under her name through RAC's credit division, AcceptanceNow.[2] Plaintiff claims that despite RAC knowing that the account does not belong to Plaintiff, the account continues to appear on her credit history.[3]

On July 7, 2021, RAC filed a motion to compel arbitration between Plaintiff and RAC.[4] On August 2, 2021, the Court ordered Plaintiff to arbitrate her claims against RAC, leaving Plaintiff's claims against Experian and Trans Union active in this Court.[5] Pending before the Court is Experian and Trans Union's (collectively, "Moving Defendants") "Motion to Stay

---

[1] Rec. Doc. 1.

[2] *Id.* at 2.

[3] *Id.* at 4, 6.

[4] Rec. Doc. 17.

[5] Rec. Doc. 36.

1

Pending Arbitration."[6] Plaintiff opposes the motion.[7] Having considered the motion, the memoranda in support and in opposition, the record, and the applicable law, the Court grants the motion.

## I. Background

On May 18, 2021, Plaintiff filed a complaint in this Court.[8] In the Complaint, Plaintiff alleges that on January 8, 2021, she discovered that an account had been fraudulently opened in her name in RAC's credit division, AcceptanceNow.[9] Plaintiff claims that she "immediately commenced the dispute process, as she did not open any such AcceptanceNow account" and "had not purchased or leased any furniture" at the time the account was opened.[10] Plaintiff alleges that she filed a police report and submitted formal disputes with Trans Union and Experian.[11] Plaintiff claims that both credit agencies "responded . . . that the account was accurate" and refused to remove the entry from her credit report.[12]

Plaintiff alleges that thereafter, she reported the account to RAC.[13] Plaintiff claims that a division of RAC, Preferred Lease, instructed her to submit additional information, which Plaintiff did in the form of evidence of her identity and a copy of the complaint she had submitted to the

---

[6] Rec. Doc. 37.

[7] Rec. Doc. 40.

[8] Rec. Doc. 1.

[9] *Id.* at 2.

[10] *Id.* at 3.

[11] *Id.*

[12] *Id.* at 3–4.

[13] *Id.* at 4.

police.[14] Plaintiff alleges that a Preferred Lease employee, James Simmons, then emailed a Preferred Lease Reporting Specialist, Valerie Rosen, informing Ms. Rosen that RAC employees had opened fraudulent accounts in the names of RAC customers and requesting that such accounts be removed from the customers' credit reports.[15] Plaintiff claims that on March 12, 2021, she received confirmation from AcceptanceNow that the account had been fraudulently opened by an RAC employee and that the account would be closed.[16] Plaintiff claims that she was "promised the account would be removed from [her] credit history, but that it would take 30-60 days to accomplish."[17]

Despite this promise, Plaintiff alleges that to date Experian and Trans Union, along with Equifax Information Services, LLC, all report that Plaintiff "owes a balance of $3,753.00 to AcceptanceNow."[18] Plaintiff claims that "rather than close the fraudulent account, RAC reported it as a charge-off" and "rather than conduct any re-investigation of RAC's verifications, Trans Union and Experian simply rubber-stamped RAC's erroneous reports."[19] Plaintiff claims that the presence of the fraudulent account on her credit report has led to her being "turned down for an application for credit through Pay[P]al" and prevented her from "securing approval for a car loan at an interest rate she should otherwise be entitled to."[20]

In this suit, Plaintiff brings the following claims: (i) negligent noncompliance with the

---

[14] *Id.*

[15] *Id.*

[16] *Id.* at 5.

[17] *Id.*

[18] *Id.* at 5–6.

[19] *Id.* at 6.

[20] *Id.*

Fair Credit Reporting Act ("FCRA") against RAC; (ii) willful noncompliance with the FCRA against RAC; (iii) unfair trade practices under Louisiana Revised Statute § 51:1409 against RAC; (iv) violation of the Fair Debt Collections Practices Act ("FDCPA") by RAC; (v) negligent noncompliance with the FCRA against Trans Union; (vi) willful noncompliance with the FCRA against Trans Union; (vii) negligent noncompliance with the FCRA against Experian; and (viii) willful noncompliance with the FCRA against Experian.[21]

On August 2, 2021, the Court ordered Plaintiff to arbitrate her claims against RAC.[22] On August 12, 2021, Moving Defendants filed the instant motion to stay.[23] On August 30, 2021, Plaintiff filed an opposition to the instant motion.[24] On September 9, 2021, Moving Defendants filed a reply brief in further support of the motion.[25]

## II. Parties' Arguments

### A.   *Moving Defendants' Arguments in Support of the Motion to Stay*

Moving Defendants seek a stay of the instant matter pending the conclusion of the arbitration between Plaintiff and RAC.[26] Moving Defendants argue that a stay is warranted because "the accuracy and damages issues to be resolved in the Arbitration will closely resemble, if not mirror, the issues pending before this Court."[27] Moving Defendants claim that Plaintiff's claims against Moving Defendants, and whether Moving Defendants' credit reports were

---

[21] *Id.* at 6–12.

[22] Rec. Doc. 36.

[23] Rec. Doc. 37.

[24] Rec. Doc. 40.

[25] Rec. Doc. 46.

[26] Rec. Doc. 37-1.

[27] *Id.* at 3.

accurate, "depends, in large part, on the inputs generated by RAC and any information provided to them by Plaintiff."[28] Moving Defendants contend that "[d]etermining these issues first in the Arbitration will prevent inefficient concurrent proceedings, unnecessary confusion, and potentially inconsistent results."[29]

Specifically, Moving Defendants argue that for Plaintiff's claims against Moving Defendants under the FCRA to succeed, Plaintiff must show that RAC provided inaccurate reporting of the alleged fraudulent account.[30] Moving Defendants assert that "accurate reporting [by RAC] is a complete defense to a claim" against Moving Defendants.[31] Therefore, Moving Defendants contend that a stay is necessary because the arbitration will "necessarily adjudicate the accuracy of RAC's reporting, which will in turn impact (and may even determine) Plaintiff's FCRA claims" against Moving Defendants.[32]

Moving Defendants argue that permitting this matter to proceed at the same time as the arbitration will lead to a waste of judicial resources.[33] Moreover, Moving Defendants argue that a stay is necessarily to prevent "confusion and inconsistent results" and to prevent Plaintiff from recovering damages twice, once in each proceeding.[34] Finally, Moving Defendants assert that a stay of the instant matter would not prejudice Plaintiff, as she will be "spared having to duplicate her efforts in both the Arbitration and this action" and because the arbitration will allow RAC and

---

[28] *Id.*

[29] *Id.*

[30] *Id.* at 4.

[31] *Id.*

[32] *Id.*

[33] *Id.* at 5.

[34] *Id.* at 5–6.

Plaintiff, parties to the contract in question in this litigation, to "resolve underlying issues" which will "facilitate a more efficient resolution" of any remaining claims against Moving Defendants.[35]

**B.      *Plaintiff's Arguments in Opposition to the Motion to Stay***

Plaintiff argues that a stay is not appropriate because the Fifth Circuit's three factor test for issuance of a mandatory stay is not met. Under that test, Plaintiff asserts that: (1) the arbitrated and litigated disputes involved different operative facts; (2) the claims asserted in arbitration and litigation are not "inherently inseparable"; and (3) the litigation would not have a "critical impact" on the arbitration.[36]

As to the first factor, Plaintiff argues that because RAC has already admitted that the account at issue was fraudulently opened, the arbitration will concern only damages, not liability, and thus continued litigation "on the merits of [Plaintiff's] claims against Defendants here will in no way implicate the same operative facts."[37] As to the second factor, Plaintiff similarly argues that because her claims against RAC concern only damages, and her claims against Moving Defendants are about their re-investigations of the fraudulent account, her claims against RAC are "utterly separable" from her claims against Moving Defendants.[38] As to the third factor, Plaintiff argues that continued litigation will not have a "critical impact" on the arbitration because whether Moving Defendants "are liable for failing to abide by their obligations under the Fair Credit Report Act for falling to conduct adequate re-investigations of RAC's responses to [Plaintiff's] disputes, or not, is immaterial to the arbitrator's ruling as to RAC's liability for

---

[35] *Id.* at 6–7.

[36] Rec. Doc. 40 at 3–7.

[37] *Id.* at 4.

[38] *Id.* at 5.

6

punitive damages, or not."[39]

## C.     *Moving Defendants' Arguments in Further Support of the Motion to Stay*

In response, Moving Defendants argue that the three factor test that Plaintiff identifies is used to determine whether a non-signatory to an arbitration agreement may seek a *mandatory* stay under Section 3 of the Federal Arbitration Act.[40] Moving Defendants point out that they are not asking for a mandatory stay, and instead are asking that this Court "in the interest of fairness and judicial economy—and within [the Court's] sound discretion irrespective of any such criteria—grant a discretionary stay" pending the conclusion of the arbitration.[41] Moving Defendants argue that the three factors applicable to mandatory stays are still relevant in analyzing whether to grant a discretionary stay, but are not dispositive.[42] Nevertheless, Moving Defendants contend that the factors weigh in favor of the Court granting a discretionary stay.[43]

As to the first factor, Moving Defendants assert that "the same operative facts—that is, Plaintiff's alleged identity theft caused by RAC, which led to her submitting disputes to [Moving] Defendants—control the resolution of the claims being litigated and arbitrated."[44] Moving Defendants argue that they are "not bound" by any "out-of-context" statements made by RAC's counsel allegedly admitting that the account was fraudulent.[45] Furthermore, Moving Defendants argue that a party's defenses do not determine whether the proceedings are based on the same

---

[39] *Id.* at 6.

[40] Rec. Doc. 46 at 1.

[41] *Id.* at 2.

[42] *Id.* at 3

[43] *Id.*

[44] *Id.*

[45] *Id.* at 4.

operative facts, and therefore this factor favors a stay even though litigation against the remaining Defendants "involve their efforts to re-investigate Plaintiff's disputes."[46]

Under the second factor, Moving Defendants argue that for a discretionary stay, courts apply a less rigorous standard and analyze whether the claims "significantly overlap."[47] Using either the "significantly overlap[ing]" or "inherently inseparable" standard, however, Moving Defendants assert that this factor favors a stay because "whether the RAC account information is accurate—an issue that undoubtedly will be adjudicated as part of Plaintiff's arbitration with RAC—is the threshold issue in Plaintiff's litigation against Defendants."[48] Moving Defendants further state that both proceedings involve other overlapping issues, such as "the reasonableness of Defendants' reporting of the RAC account" and "the extent of damages available to Plaintiff and whether such damages, if any, were caused by RAC or either of the other Defendants."[49]

As to the third factor, Moving Defendants state that they are "not arguing here that the resolution of Plaintiffs' claims against [Moving] Defendants will have a 'critical impact' on the arbitration."[50] Instead, they assert that for a discretionary stay, the Court should consider whether the outcome of the arbitration will be helpful to the litigation.[51] They contend that the arbitration will "adjudicate key issues in the litigation between Plaintiff and Defendants," "significantly decrease the amount and scope of discovery," and possibly facilitate settlement.[52] Therefore,

---

[46] *Id.*

[47] *Id.* at 4–5.

[48] *Id.* at 5.

[49] *Id.*

[50] *Id.* at 6.

[51] *Id.*

[52] *Id.*

Defendants contend that the arbitration will have a significant impact on the litigation, which weighs in favor of granting a discretionary stay.[53]

### III. Legal Standard

The Federal Arbitration Act was enacted in order to "allow[] a party to . . . an arbitration agreement to petition any United States district court for an order directing that such arbitration proceed in the manner provided for in such agreement."[54] In *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, the Fifth Circuit explained that the FAA was "in large part motivated by the goal of eliminating the courts' historic hostility to arbitration agreements."[55] The Fifth Circuit further explained that "Section 2 of the FAA puts arbitration agreements on the same footing as other contracts."[56] This means that, "as a matter of federal law, arbitration agreements and clauses are to be enforced unless they are invalid under principles of state law that govern all contracts."[57]

Under the FAA, there is a "strong federal policy in favor of enforcing arbitration agreements."[58] Section 3 of the FAA provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration . . . the court . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. . . .[59]

---

[53] *Id.*

[54] *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989) (internal quotation marks omitted).

[55] 379 F.3d 159, 166 (5th Cir. 2004).

[56] *Id.*

[57] *Id.*

[58] *Texaco Expl. & Prod. Co. v. AmClyde Engineered Prod. Co.*, 243 F.3d 906, 909 (5th Cir. 2001) (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985)).

[59] 9 U.S.C. § 3.

"[I]f the issues in a case are within the reach of that [arbitration] agreement, the district court has no discretion under section 3 to deny the stay."[60]

Traditionally, federal courts applied the FAA only to parties to an arbitration agreement.[61] However, Section 3 of the FAA provides parties not subject to an arbitration agreement with "the right to ask the court for a mandatory stay of litigation, in favor of pending arbitration to which they are not a party."[62] A mandatory stay of non-arbitrable claims is appropriate in very limited circumstances.[63] The Fifth Circuit instructs courts to consider three factors in determining whether to stay non-arbitrable claims: (i) whether the same operative facts are involved in the litigation and arbitration; (ii) whether the claims are inseparable; and (iii) whether allowing litigation to proceed would affect arbitration.[64] "The question is not ultimately one of weighing potential harm to the interests of the [parties not subject to arbitration], but of determining whether proceeding with litigation will destroy the . . . right to a meaningful arbitration."[65]

Furthermore, where a mandatory stay is not required, a district court retains the discretion to stay litigation among the non-arbitrating parties pending the outcome of the arbitration "simply as a means of controlling its docket."[66] The district court has "broad discretion" in determining

---

[60] *Texaco Expl. & Prod. Co.*, 243 F.3d at 909 (citing *Hornbeck Offshore Corp. v. Coastal Carriers Corp.*, 981 F.2d 752, 754 (5th Cir. 1993)).

[61] *Adams v, Georgia Gulf Corp.*, 237 F.3d 538, 540 (5th Cir. 2001); *see also Matter of Talbott Big Foot, Inc.*, 887 F.2d 611,614 (5th Cir. 1989).

[62] *Waste Mgmt., Inc. v. Residuous Industriales Multiquim, S.A. de C.V.*, 372 F.3d 339, 342 (5th Cir. 2004).

[63] *Id.*

[64] *Id.* at 343–45; *Hill v. G E Power Sys., Inc.*, 282 F.3d 343, 347 (5th Cir. 2002).

[65] *Waste Mgmt.*, 372 F.3d at 343.

[66] *Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 755 (5th Cir 1993) (citing *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 21 n. 24 (1983). *See also Broussard v. First Tower Loan, LLC*, No. 15-1161 2016 WL 879995 at *5 (E.D. La March 6, 2016) (Barbier, J.); *Mosaic Underwriting Service, Inc. v. Moncla Marine Operations, LLC*, No. 12-2183 2013 WL 2903083 at *7 (E.D.

whether a discretionary stay is appropriate, and the analysis "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."[67] In analyzing whether a discretionary stay is appropriate, courts in this circuit still consider the three *Waste Management* factors.[68] However, given the district courts' broad discretion, courts in this circuit apply those factors less rigorously than they do for a mandatory stay.[69]

## IV. Analysis

In the instant motion, Moving Defendants do not contend that a mandatory stay is applicable, and instead seek only a discretionary stay.[70] Plaintiff opposes the motion and argues that a stay is not warranted.[71] Considering the *Waste Management* factors, as well as the Court's judgment as to control of its docket, for the reasons that follow, the Court finds that a discretionary stay of this litigation pending the outcome of the RAC arbitration is appropriate.

Under the first *Waste Management* factor—whether the arbitrated and litigated disputes involved the same operative facts—Plaintiff argues that the disputes do not involve the same operative facts. According to Plaintiff, because RAC has admitted that the account at issue was

_____

La. June 12, 2013) (Feldman, J.).

[67] *Wedgeworth v. Fireboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983) (*quoting Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936)).

[68] *See Broussard*, 2016 WL 87995 at *6 (collecting cases).

[69] *See Mosaic*, 2013 WL 1556141 at *6 ("[A]lthough the operative facts might not be identical to command a mandatory stay, the facts do overlap extensively and weigh in favor of a discretionary stay"); *Suzlon Infrastructure, Ltd v. Pulk.*, No. 9-2206 2010 WL 3540951 at *8 (S.D. Tex. Sept 10, 2010) (same); *Broussard*, 2016 WL 879995 at *6 (asking whether the claims asserted in the litigation and arbitration "significantly overlap," rather than whether they are "inherently inseparable"); *Suzlon*, 2010 WL 3540951 at *8 (same).

[70] Rec. Doc. 46 ("To be clear: Defendants are not seeking (nor did their Motion request) a mandatory stay in proceedings pursuant to Section 3 of the FAA. Rather, Defendants request that this Court, in the interest of fairness and judicial economy—and within its sound discretion irrespective of any such criteria—grant a discretionary stay in this litigation pending the conclusion o the arbitration between Plaintiff and RAC.").

[71] Rec. Doc. 40.

11

fraudulent, the arbitration will concern damages only, while the continued litigation against Moving Defendants will concern the merits of Plaintiff's claims that Moving Defendants failed to properly investigate the fraudulent accounts.[72] In reply, Moving Defendants argue that they are "not bound" by the alleged statements of RAC's counsel admitting liability.[73]

It is clear that both disputes arise out of the same event—the creation of an allegedly fraudulent account.[74] Although the Court acknowledges that RAC does not dispute whether the account was fraudulent,[75] the arbitration and any continued litigation both involve the fraudulent account and the damages that its creation may have caused Plaintiff. Therefore, the Court finds that there is extensive overlap between the operative facts of the arbitrated and litigated claims, which is sufficient to favor a discretionary stay.[76]

Under the second *Waste Management* factor—whether the claims are inherently inseparable—Plaintiff argues that the claims are "utterly separable" because the RAC arbitration will concern damages, and continued litigation against Moving Defendants will concern their "re-investigations of RAC's responses to [Plaintiff's] disputes."[77] Moving Defendants argue in response that the accuracy of RAC's account information is a "threshold issue in Plaintiff's litigation against [Moving] Defendants" that will "undoubtedly" be adjudicated in the

---

[72] Rec. Doc. 40 at 4.

[73] Rec. Doc. 46 at 4.

[74] *See generally* Rec. Doc. 9.

[75] Rec. Doc. 39 ("To be safe, undersigned counsel directed [RAC] to submit a Universal Data Form to all three major credit reporting agencies on July 28, 2021, the date of the hearing, requesting again that the tradeline be deleted due to fraud to ensure that there was no confusion regarding [RAC]'s position regarding the account."); Rec. Doc. 48 at 4–7 (discussing at oral argument that there is no dispute regarding the account being fraudulent).

[76] *See, e.g., Mosaic*, 2013 WL 1556141 at *6.

[77] Rec. Doc. 40 at 5.

arbitration.[78] However, as discussed above, it appears that RAC does not dispute that the account at issue was fraudulent.[79] As a result, it is unclear whether the arbitration will address this issue.

Nevertheless, as Moving Defendants further argue, both proceedings will necessarily address "the extent of damages available to Plaintiff and whether such damages, if any, were caused by RAC or either of the [Moving] Defendants."[80] Because it appears that RAC will not dispute that the account was fraudulent, it seems that the arbitration will focus on determining Plaintiff's damages.[81] Furthermore, to recover against Moving Defendants on her claims under the Fair Credit Reporting Act, Plaintiff will have to prove, among other things, that she: (1) suffered injury and (2) her injury was caused by the inclusion of the inaccurate entry.[82] Therefore, although not all issues will be identical in both proceedings, the extent of damages would need to be determined in both.

As the Court explained, in determining whether a *discretionary* stay is warranted, courts in this circuit look to whether the claims "significantly overlap," even if they are not "utterly inseparable."[83] Because the Court finds that the claims in the arbitration and any continued litigation will, at the very least, "significantly overlap," the Court finds that the second factor

---

[78] Rec. Doc. 46 at 5.

[79] Rec. Docs. 39, 48.

[80] Rec. Doc. 46 at 5.

[81] Counsel for RAC acknowledged as much at oral argument. Rec. Doc. 48 at 4–7.

[82] Negligent noncompliance with 15 U.S.C. § 1681e(b) consists of four elements: (1) inaccurate information was included in a consumer's credit report; (2) the inaccuracy was due to defendant's failure to follow reasonable procedures to assure maximum possible accuracy; (3) the consumer suffered injury; and (4) the consumer's injury was caused by the inclusion of the inaccurate entry. *Cortez v. Trans Union*, LLC, 617 F.3d 688, 708 (3d Cir. 2010).

[83] *Broussard*, 2016 WL 879995 at *6 (analyzing whether the claims asserted in the litigation and arbitration "significantly overlap," rather than whether they are "inherently inseparable"); *Suzlon*, 2010 WL 3540951 at *8 (same).

favors a discretionary stay.

Under the third factor—whether litigation of these claims would have a critical impact on the arbitration—Plaintiff argues that litigation of Moving Defendants' liability would have no impact on the arbitrator's ruling as to RAC's damages.[84] Moving Defendants, in response, do not contend that litigation of the claims against Moving Defendants would have a critical impact on the arbitration.[85] Instead, Moving Defendants argue that because they are only seeking a discretionary stay, the Court should look instead to whether staying the litigation pending arbitration will impact the litigation and promote the interests of efficiency, fairness, and judicial economy.[86]

In analyzing this factor in the context of a mandatory stay, the Fifth Circuit has explained that "[t]he question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration."[87] However, courts in this Circuit have found that when arbitration may benefit the parties to the litigation, that is sufficient to favor a discretionary stay.[88] Furthermore, district courts have long had the inherent authority to stay proceedings when the "economy of time and effort for [the court], for counsel, and for litigants" favors doing so.[89]

In the interest of efficiency and judicial economy, the Court finds that this litigation should

---

[84] Rec. Doc. 40. At 6.

[85] Rec. Doc. 46 at 6.

[86] *Id.*

[87] *Waste Management*, 372 F.3d at 343.

[88] *Broussard*, 2016 WL 879995 at *6; *Suzlon*, 2010 WL 3540951 at *9.

[89] *Landis*, 299 U.S. at 254.

be stayed pending the arbitration between Plaintiff and RAC. The arbitration will adjudicate the extent of Plaintiff's injuries, which is an issue that necessarily will arise in any continued litigation against Moving Defendants. Judicial economy counsels against duplicating the arbitrator's efforts.

Given that all three *Waste Management* factors, as applied to discretionary stays, support the issuance of a stay, the Court will stay Plaintiff's claims against Moving Defendants pending the ongoing arbitration between Plaintiff and RAC.

### V. Conclusion

Based on the foregoing,

**IT IS HEREBY ORDERED** that Defendants Trans Union LLC and Experian Information Solutions, Inc.'s "Motion to Stay Pending Arbitration"[90] is **GRANTED.**

**IT IS FURTHER ORDERED** that the above-captioned matter is **STAYED** and **ADMINISTRATIVELY CLOSED** to be reopened upon motion of a party at the conclusion of the arbitration proceedings.

**NEW ORLEANS, LOUISIANA,** this  18th  day of November, 2021.

_Nannette Jolivette Brown_
_____
**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[90] Rec. Doc. 37.